## PROCEDURAL HISTORY

The Riverside County California District Attorney's Office filed a first amended felony information against Petitioner on October 29, 2019 charging

In count 1, a violation of Cal. Penal Code § 288.7(b) occurring on or about and between December 19, 2012 and June 19, 2013 as against one Jane Doe (Z.R.); and,

In count 2, a violation of Cal. Penal Code § 288.7(b) occurring on or about and between December 09, 2012 and January 04, 2014 as against one Jane Doe (Z.R.); and,

In counts 3-7, a violation of Cal. Penal Code § 288(a) occurring on or about and between July 31, 2013 and January 04, 2017 as against one Jane Doe (Z.R.) and also as to each count a special allegation pursuant to Cal. Penal Code § 667.61 that the case involved more than one victim; and,

In count 8 with a misdemeanor violation of Cal. Penal Code § 647.6(a) as against one Jane Doe (Z.R.) and occurring on or about and between January 05, 2018 and July 04, 2018; and,

In count 9, with a violation of Cal. Penal Code § 288 (a), as against one Jane Doe (M.D.) occurring on or about and between February 04, 2000 and December 31, 2000 and further containing a special allegation pursuant to Cal. Penal Code § 667.61 that the case involved more than one victim. Each said offense was alleged to have occurred within the County of Riverside.

Petitioner entered pleas of not guilty as to all counts charged in the said first amended information and denied all special allegations contained therein.

Trial of the instant matter commenced on October 15, 2019. Trial was

had by jury and was presided over by the Honorable F. Paul Dickerson, III. On October 30, 2019, the jury returned verdicts of guilty as to all counts charged in the said first amended information, save for count 2, which the jury found Petitioner not guilty. The jury also found to be true the special allegations attached to counts 3-7 and count 9.

On December 06, 2019, the court below sentenced Petitioner. The court imposed an indeterminate sentence of 15 years to life in state prison as to counts 1, 3 through 7, and count 9, and imposed a sentence of 1 year in county jail as to count 8, with credit for time served thereon. As to counts 1 and 2, the court agreed with the contention of the Deputy District Attorney that punishment for said counts was to be stayed pursuant to Cal. Penal Code § 654. Petitioner's aggregate term of imprisonment was, therefore, 90 years to life. Petitioner received pre-sentence custody credit of 409 days, along with conduct credits of 61 days for a total presentence credit of 470 days. (I CT 282.)

Petitioner appealed his conviction to the California Court of Appeal, Fourth Appellate District. On June 09, 2021, the Court of Appeal affirmed the conviction in full – save for correcting fines and fees that had been imposed erroneously.

On July 16, 2021, Petitioner filed a petition for review in the California Supreme Court. On August 18, 2021, the California Supreme Court summarily denied review.

As a result of the criminal matter referenced herein, Petitioner is currently confined to the Substance Abuse Treatment Facility and State Prison, Corcoran. The named Respondent in this action is the warden of said facility. Counsel for Petitioner is unaware of any other cases pending

in any court connected with the instant matter.

STATEMENT OF FACTS

The factual history is gathered from the trial court record:

<u>Prosecution Case</u>.

The People first called Jacqueline Palic, who testified that she was born on September 10, 1962 and hailed from the state of Kansas where she has always lived. (I RT 20.) She testified that Petitioner was her older cousin and that he was 9 years older than she. (I RT 21-22, 24.) She testified that when she was roughly 7 years of age, she and roughly 11 others were outside of their Kansas home playing with a Frisbee and that Petitioner took the Frisbee and ran into the house and into a bedroom and that she followed him into the room. (I RT 24-25, 45.) Petitioner locked the door to the room so that she could not get out and Petitioner started masturbating and eventually he ejaculated, returned the Frisbee to her, and left. (I RT 25-26.)

Ms. Palic described another incident where she was in the third grade and she was with a cousin and a friend and Petitioner and she asked Petitioner to open the zipper on his pants and Petitioner said no, whereupon her cousin and the friend left; leaving her and Petitioner alone. (I RT 27.) When her cousin and friend had left, Petitioner told her that doing those things was just for her; whereupon he opened the zipper on his pants and commenced to masturbate and, at one point he sat her on top of him, which she described as painful, but she denied there being any penetration. (I RT 27.)

Ms. Palic described another incident when she was 9 years of age and during which she was staying overnight at Petitioner's home in Kansas

and, while she was asleep, Petitioner pulled down her pants and orally copulated her. (I RT 31.)

On another occasion when she was 9 years of age, and she was staying overnight at Petitioner's home in Kansas, Petitioner had tried to pull down her pants and she screamed and Petitioner backed out of the room. (I RT 33.)

Ms. Palic testified that, when she was older she worked at a restaurant owned by Petitioner and, when she was there with her boyfriend, Petitioner approached and said that she had the "sweetest pussy" he has ever "tasted." (I RT 41.)

The People next called Jane Doe (M.D.) (MD). MD testified she was born on February 04, 1989, that she grew up in Murrieta, California, and that she described attending school with one Janessa Bredemeier. (I RT 56.) She testified that Petitioner was the father of the said Janessa Bredemeier. (I RT 58.) She testified that, on a particular occasion when she was aged 11 years and in the fifth grade, she went swimming with Janessa Bredemeier and that she was going to spend the night at the Bredemeier abode, and she testified she went to the Bredemeier abode still in her swimming attire, which she described as a 2 piece bathing suite with an image of the Warner Bros. cartoon character Tweety on it. (I RT 59-61.)

She testified that she went to sleep on the floor in the said Janessa Bredemeier's room and that she wore the bathing suit with a shirt and shorts over it. (I RT 62.) She was awakened in the night by the sensation of Petitioner lying on the floor next to her; her shorts and bathing suit bottoms pulled down, and Petitioner rubbing her clitoris with his finger. (I RT 62.) When she was cognizant of this, she demanded to know why her

4

shorts and bathing suit were off, at which point Petitioner got up from the floor, covered himself with his robe, and left the room. (I RT 62.) She awakened Janessa Bredemeier and told the latter that she wanted to go home, but, when they went to leave, Petitioner was there and forbade her from going home; stating that it was too late and her family would be asleep. (I RT 62.) She eventually was able to leave and went home; however she did not tell her family. (I RT 62.)

After she had graduated high school, she told her mother of what had happened to her at the Bredemeier abode that evening, and her mother was upset and demanded that she report it to the appropriate authorities, which she did; however, no criminal charges were filed at that time. (I RT 76-77.)

The People called Carol Prieto to testify. She testified that she was the grandmother of one Jane Doe (Z.R.) (ZR), whose date of birth she testified was January 05, 2006.[1] (I RT 94.) She testified that, on February 14, 2017, ZR came to live with her at her place of abode in Indio, Riverside County, California from where she had been living with a family who had adopted her – the Ruckels family. (I RT 94.) In July 2018, she noticed that ZR was a depressed and troubled child, so she decided to check ZR's mobile telephone, and, when she did, she observed messages from "the defendant" saying that he "loved her" and that he "missed her." (I RT 99-101.)

The People called ZR. She testified she was born on January 05, 2003. (I RT 110.) She testified that she had lived with the Ruckels family and that she met Petitioner and that they lived in Temecula, Riverside County,

---

[1]    ZR would later testify that her date of birth was January 05, 2003. (I RT 110.)

California. (I RT 111-112.)

She testified that, in 2012, she went to see the motion picture
Monsters, Inc. (Pixar 2001) with members of her family and Petitioner at a
movie theater in Temecula. (I RT 116-117.) She testified that, during the
showing of the movie, Petitioner put his hands up her shorts and down her
shorts and asked her to kiss him. (I RT 118-119, 120.) She testified she did
not know if Petitioner's fingers penetrated her vagina because she was
young but she thought that it happened. (I RT 120.) Petitioner also told her
that she was "hotter than" his wife. (I RT 121.)

She testified that, when she was 9 or 10 years old, she went to another
motion picture with her family and Petitioner and that Petitioner stuck his
hand up her pants again, and that she did not know if his finger went into
her vagina. (I RT 122-123.)

She testified that Petitioner had a swimming pool and that her
adopted family – the Ruckels – would take her and her siblings there to
swim in the summertime. (I RT 126.) She testified that, before she turned
14, at Petitioner's house, when she was in the spa, Petitioner would get in
the spa too. (I RT 127-128.) She testified that Petitioner touched her on her
bathing suit near her vagina. (I RT 127-128.) She testified that Petitioner
touched her vagina in this manner more than 2 times, but she does not
know if it was more than 2 times. (I RT 127-128.)

She testified that, in January 2017, Petitioner took her out for her
birthday and at one point he told her that if she ever had any questions
about sex, she could ask him and he would be able to assist her. (I RT 140-
143.)

She testified that after she moved in with her grandmother, she

6

stayed in periodic communication with Petitioner on the social media site Instagram. (I RT 144.) She testified that she told her grandmother about the sexual acts with Petitioner and then contacted him through Instagram to obtain corroboration for her allegations. (I RT 166.) While messaging Petitioner, Petitioner sent her messages through Instagram that he loved her and wanted her to be his girlfriend. (I RT 151-152.)

She denied Petitioner ever performing any sexual acts with her at church. (I RT 147.) She said that the church they attended had a "crying room" where parents could take crying children so as to not disturb others attending the services, but that she never was in the "crying room" with Petitioner. (I RT 179.) She testified that, while her and her family and Petitioner attended the same church, each went to a different church service. (I RT 185.)

The People called one Jody Ward to testify. Ms. Ward testified she was a clinical and forensic psychologist. (I RT 188.) She testified generally regarding Child Sexual Abuse Accommodation Syndrome (CSAAS), which she described as a non-diagnostic syndrome. (I RT 191, 195.)

She testified that the hallmarks of this "syndrome" are secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction and recanting. (I RT 200.) She testified that secrecy refers to the fact that incidents of abuse happen in secret; although others may be in the vicinity. (I RT 201.) She testified that secrecy also refers to the fact that children will keep the acts a secret out of loyalty to the abuser. (I RT 201.)

She testified that helplessness refers to the fact that children will go along with what a trusted adult wants because they do not have an effective

7

means of redressing the issues themselves. (I RT 205.)

She testified that helplessness relates to disclosure issues because children who disclose and are not believed or who make incomplete or unconvincing disclosures are "psychologically orphaned" and that when children do report and nothing happens, the abuser can be emboldened. (I RT 207-208.)

She testified that entrapment happens because children do not have an effective means of getting out of the abuse. (I RT 209.)

As to delayed disclosure, she testified that two-thirds of children who are sexually abused do not reveal it until they are adults. (I RT 210.) She also testified that when children do disclose that they have been abused, they seldom disclose every act all at once. (I RT 214.) She testified that children will retract allegations when they see the issues it creates for them and they want that to stop. (I RT 214-215.)

The People called Alexis Ruckel. He testified that he had lived with ZR and that he was born on September 13, 2001. (I RT 226.) He testified that he knew and was good friends with Michael Bredemeier and that he did not remember conversations with ZR about him and did not remember speaking with law enforcement or Child Protective Services. (I RT 227-229.) He later testified that he did not believe ZR regarding Michael Bredemeier because ZR tells too many lies. (I RT 232.)

The People called Robert Cornett, who testified he was a Riverside County Sheriff's Deputy with 25 years in law enforcement. (I RT 234.) He testified that he served a search warrant at Petitioner's home on October 24, 2018. (I RT 235-236.) He testified taking possession of Petitioner's mobile telephone and searching it and finding website history for sites with

titles, "Father Fucks Schoolgirl Daughter" and "Father and Daughter Live on Cute Baby Cam." (I RT 243.) He also testified that he saw book titles, "The Bondage Breaker: Overcoming Negative Thoughts, Irrational Feelings, and Habitual Sins" by Neil Anderson, and "Healing the Wounds of Sexual Addiction" by Mark Laser, and "Breaking Porn Addiction and how to Quit for Good" by J.S. Park. (I RT 245.) He testified that he found images of adult pornography on Petitioner's mobile device and he conceded he did not know who else may have had access to Petitioner's mobile telephone and that the subject matter of the books could have related to adult pornography. (I RT 247-248.)

The People next called Gerald Franchville, who testified he had 21 years of law enforcement experience. (I RT 249.) He testified that ZR said during her forensic interview that Petitioner put his fingers in ZR's vagina in the "cry room" of the church. (I RT 254, 258.) He testified that ZR told Alexis Ruckel that she was inappropriately touched but Alexis Ruckel said that it did not happen because ZR lies. (I RT 263.) He testified that the motion picture Monsters, Inc. was released in 3-D on December 19, 2012. (I RT 280-281.)

The People and Petitioner stipulated Petitioner's date of birth was October 27, 1953. (I RT 187.)

<u>Defense Case.</u>

The defense called Christopher Ruckel to testify. He testified that he was ZR's sister and that he had a good relationship with ZR and with Petitioner. (II RT 288-289.) He testified that he remembered going to see Monsters, Inc. in 2012 and that ZR sat between him and Petitioner. (II RT 291.) He testified he did not see anything unusual happen during the movie

that that ZR was acting normal after the movie and was not upset. (II RT 290-292.) He testified that he remembered seeing another movie with Petitioner and ZR and the family, and that was Cowboys & Aliens (Universal Pictures 2011). (II RT 293.) As with Monsters, Inc., he testified that no one was told where to sit and that nothing unusual happened and that ZR was not out of sorts after they left the theater. (II RT 293-294.)

The defense also called Marlys Ruckel. She testified that she is ZR's adopted mother and that she knows Petitioner and his wife. (II RT 306.) She testified that to her recollection, ZR was only ever alone with Petitioner twice and that on each occasion it was her birthday. (II RT 307-307.) She testified that ZR did not seem upset or out of sorts after being alone with Petitioner. (II RT 309.) She testified that the children always liked Petitioner and wanted to sit next to him. (II RT 310.)

The defense called Janessa Reyes, who testified she was Petitioner's daughter and knows MD. (II RT 320.) She testified that, throughout her childhood, she had roughly 10 different girls sleep at her house and that MD slept over 2 or 3 different times. (II RT 321.) She recalled the sleepover where MD was on the floor in her room and that she said that MD turned on the light and told her that Petitioner had done something" and then they went back to sleep. (II RT 324.) She said that MD had slept over her house after this occasion. (II RT 325.) She testified that, in 2000, Petitioner weighed 400-500 pounds and that he was not able to walk very well. (II RT 325-326.)

*People's Rebuttal Case.*

The People recalled Marlys Ruckel. She testified that a comment Petitioner made regarding ZR on social media had concerned her,

specifically, Petitioner's statement that ZR was a "hottie." (II RT 335.) She testified that ZR's grandmother had read the Instagram messages between ZR and Petitioner and she was concerned and scared. (II RT 336.)

The People also called Daniel Ruckel. He testified he was married to Marlys Ruckel and that ZR was their adopted child. (II RT 339.) He testified that he was surprised about the Instagram messages between ZR and Petitioner and that he confronted Petitioner about them and Petitioner did not deny them. (II RT 340-342.)

## ARGUMENT

I.   INSUFFICIENT EVIDENCE SUPPORTS PETITIONER'S CONVICTION ON COUNT 1, AND, AS SUCH, HIS CONVICTION VIOLATES FEDERAL DUE PROCESS.

This claim is based upon a violation of Petitioner's rights under the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Specifically, that the prosecution failed to submit sufficient evidence to support Petitioner's conviction on count 1 – Cal. Penal Code § 288.7(b). As set forth hereinafter, we submit that the evidence is insufficient as a matter of law under the federal constitution.

It is the prosecution's burden, under the due process clause of the U.S. Constitution, in a criminal case, to prove every element of a crime beyond a reasonable doubt. In re Winship, 397 U.S. 358 (1970). The United States Supreme Court has recognized that this rule applies not just to elements of substantive crimes, but also to any sentencing enhancements or special allegations that serve to increase or enhance punishment for crimes. Apprendi v. New Jersey, 530 U.S. 466 (2000). To determine whether the prosecution has introduced sufficient evidence to meet the federal burden of

proof, courts apply the "substantial evidence" test. Under this standard, the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 315-319 (1979).

In People v. Jones, 51 Cal. 3d 294 (1990), the California Supreme Court held that child molestation convictions may be based on "generic" or nonspecific testimony. When a defendant lives with the victim or has continuous access to him or her, "the victim typically testifies to repeated acts of molestation occurring over a substantial period of time but, lacking any meaningful point of reference, is unable to furnish many specific details, dates or distinguishing characteristics as to individual acts or assaults." Id. at 299. To balance both the interest in prosecuting such offenses under these circumstances, and the federal and state Due Process rights of such defendants to notice of the charges against them and a fair ability to defend against them, the court held, "even generic testimony (e.g., an act of intercourse 'once a month for three years') outlines a series of *specific,* albeit undifferentiated, incidents, *each* of which amounts to a separate offense, and *each* of which could support a separate criminal sanction." Id. at 314. The Court ruled that such evidence can be sufficient if it describes the *kind of act or acts* committed *with sufficient specificity*, the number of acts with sufficient certainty to support all the counts alleged, and the general time period during which the acts took place. Id. at 315-316.

In the instant matter, the First Amended Information charged Petitioner with committing an act that was contrary to Cal. Penal Code § 289 upon ZR when she was under the age of 10 years, thus countermanding

the provisions of Cal. Penal Code § 288.7(b). The People made it abundantly clear here that they had elected that the alleged acts of Petitioner in the movie theater during the showing of Monsters, Inc. was what they were relying upon to prove up that count. (II RT 383-384, I CT 149.)

The issue here is that a review of ZR's testimony revealed that, while Petitioner allegedly put his hands up and down her shorts, and said to kiss him, she specifically testified that, "[u]m, I don't know if it was that time that it did – that it did, because I was young, but I believe so." It is respectfully submitted that this is not "substantial evidence" that Petitioner violated Cal. Penal Code § 288.7(b) against ZR as alleged. As noted above, substantial evidence is not just any evidence to support the factual finding, but evidence such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. at 315-319.

In essence, ZR testified that she did not know if it happened but she believes that it did. The Court of Appeal ruled that ZR's testimony was to the effect that she was not sure if it happened during the viewing of Monsters, Inc. or another time when they went to the movies, and not whether it happened. This, we submit, is a distinction without a difference. The Court of Appeal's ruling does not address the point that the prosecution relied upon the allegation that Petitioner committed this specific offense during the showing of the Monsters, Inc. movie, and not at another time during another movie. Consistent with People v. Jones, 51 Cal. 3d at 294, we submit that the state courts erred in finding that there was sufficient evidence to support the specific allegation made in the First Amended Information.

II.    INSUFFICIENT EVIDENCE SUPPORTS NO MORE THAN 3 ACTS AS AGAINST ZR, AND, THEREFORE, APPELLANT'S CONVICTIONS ON OTHER COUNTS MUST BE REVERSED.

This claim is based, in part, upon a violation of Petitioner's rights under the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Specifically, that the prosecution failed to submit sufficient evidence to support Petitioner's conviction of over 3 acts as against ZR. We submit that the evidence is insufficient as a matter of law under the federal constitution. The law applicable to this claim is set forth in Point I above and is incorporated by reference herein.

In the instant matter, during her testimony, while being questioned by the prosecutor, ZR indicated that she was touched on her vagina more than 2 times, and that she could not remember being touched more than 3 times in the pool. (I RT 127-129.) This testimony was unequivocal. As plead in the information (I CT 144-147), and as the jury was instructed when they had inquired (I CT 149), the allegations contained in counts 3-7 related to these alleged incidents in the pool inasmuch as the dates were all alleged to be the same. The issue here is that the complainant, here ZR, did not indicate she had been touched more than 3 times in the spa of the pool, and, as such, we submit, 2 of those counts are not supported by sufficient evidence and must be overturned. We submit that the state courts erred in rejecting Petitioner's claims on this ground.

III.   THE   ADMISSION,   OVER   OBJECTION,   OF   THE   CSAAS
EVIDENCE   WAS   ERRONEOUS   UNDER   STATE   LAW   AND   ALSO
VIOLATED   APPELLANT'S   RIGHTS   UNDER   THE   STATE   AND
FEDERAL CONSTITUTIONS TO DUE PROCESS OF LAW.

This claim is based, in part, upon a violation of Petitioner's rights
under the "Constitution or laws or treaties of the United States." 28 U.S.C.
§ 2254(a).) Specifically, that the court erred in admitting, over objection, the
testimony of a purported CSAAS expert, inasmuch as the testimony violated
Petitioner's right to due process of law and a fair trial under the United
States constitution. Additionally, failure, on trial counsel's part, to specify
the basis of the objection resulted in Petitioner receiving constitutionally
ineffective assistance of counsel.

In the instant matter, the prosecution was permitted, over objection
(I RT 6-7), to allow Jody Ward to testify regarding Child Sexual Assault
Accommodation Syndrome (CSAAS).

A.     ADMISSION OF CSAAS EVIDENCE VIOLATED APPELLANT'S RIGHT
TO DUE PROCESS OF LAW.

A review of the record here, as well as the history and development of
CSAAS reveals that it is not scientific, and, therefore, the admission of such
testimony against Petitioner violated his Due Process rights.

Improper admission of evidence can violate due process of law;
because finders of fact – especially lay jurors – afford particular weight to
scientific evidence, due process concerns are only heightened in such
context. In Haley v. Ohio, 332 U.S. 596, 601 (1948), the High Court ruled
that, "[n]either man nor child can be allowed to stand condemned by
methods which flout constitutional requirements of due process of law." Just
as the admission of patently unreliable evidence violates the fundamental

rights of due process of law, so too does the improper exclusion of evidence. See Manson v. Braithwaite, 432 U.S. 98, 114 (1977) (reliability is the linchpin in determining the admissibility of evidence under Due Process Clause); Crane v. Kentucky, 476 U.S. 683, 690 (1986) (improper exclusion of exculpatory evidence violates Due Process Clause).

While the United States Supreme Court has recognized that the ability of a defendant to present evidence attacking the credibility of prosecution evidence, along with the operation of state and federal rules of evidence that empowers trial court judges to exclude questionable evidence serves the ends of the Due Process Clause generally, this does not end the inquiry. The High Court has recognized that, when evidence is "extremely unfair [such] that its admission violates the fundamental conceptions of justice" the Due Process Clause will operate to forbid admission of such evidence at trial irrespective of any state or federal evidentiary rules to the contrary. See Perry v. New Hampshire, 565 U.S. 228 (2012); Napue v. Illinois, 350 U.S. 264, 269 (1959)(knowing use of false evidence).

State and federal court cases dealing with the issue in terms of reliability are, we submit, instructive on the question of whether proffered scientific evidence violates the fundamental conceptions of justice for Due Process analysis.

In In Re Lockheed Litigation Cases, 115 Cal. App. 4th 558 (2004), the Court of Appeal upheld trial court's striking of an expert witness' declaration on the basis that it was speculative, unsupported by relevant scientific data and used an unreliable methodology, stating:

> An expert opinion has no value if its basis is unsound. [Citations.]
> Matter that provides a reasonable basis for one opinion does not
> necessarily provide a reasonable basis for another opinion.… [T]he

matter relied on must provide a reasonable basis for the particular
opinion offered, and that an expert opinion based on speculation or
conjecture is inadmissible.

Id. at 564.

Under California law, the predicate for application of the rule
articulated in People v. Kelly, 17 Cal. 3d 24 (1976) and the related case of
Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923) is that the expert
testimony is based, at least in some part, on a scientific technique, device,
procedure, or method that is not generally accepted in the relevant scientific
community. The predicate is not that the opinion or underlying theory
asserted by the expert is itself not generally accepted in the relevant
scientific community or is faulty. Roberti v. Andy's Termite and Pest
Control, Inc., 113 Cal. App. 4th 893, 902 (2003). Put simply, if a scientific
theory that is the subject of proffered expert testimony is "faulty" or is not
accepted, there is no need to even engage in a *Kelly/Frye* analysis.

A fortiori, this means that, if a scientific theory is long-relied upon,
but comes into disfavor, it is properly the subject of being excluded. See
United States v. Lewis, 220 F. Supp. 2d 548, 554 (S.D. W. Va. 2002). As the
Court in *Lewis* aptly noted: "If courts allow the admission of long-relied
upon but ultimately unproven analysis, they may unwittingly perpetuate
and legitimate junk science. Id.

Here, as noted by Ms. Ward's testimony, the 5 part "test" applied in
CSAAS was established by Dr. Roland Summit in 1983. As the Second
Circuit Court of Appeals observed in Gersten v. Senkowski, 426 F.3d 588,
600 (2d Cir. 2005), "research in the field reveals that the 'symptoms' which
were the alleged components of the syndrome do not occur regularly enough
in those who truly have been the victims of sexual abuse to call it a

17

'syndrome,' " and concluding that "the child sexual abuse accommodation syndrome and its alleged five components haws no validity and is not regularly accepted in the scientific community." Id. Dr. Summit published a subsequent paper in which he acknowledged such in response to what he saw as an abuse of his theory in the courts. See Summit, R., Abuse of the Child Sexual Abuse Accommodation Syndrome, 1:4 Journal of Child Sexual Abuse 153-164, 156 (1992).

In conclusion, it is submitted that, on the basis of the conclusions of Dr. Summit and testimony of Ms. Ward concerning CSAAS not being a "syndrome" and the observations above, it is submitted that the admission of this testimony violated Petitioner's Due Process rights.

Here, it is submitted that CSAAS testimony falls prey to the syllogistic fallacy. As one may recall, a syllogism is a form of deductive reasoning where one draws a conclusion by examining 2 other premises or ideas. One of the most well known syllogisms is: Socrates is a man, all men are mortal, therefore Socrates is mortal. One falls prey to the syllogistic fallacy when one of the premises that one uses to reach the conclusion one seeks to reach contains a falsehood. For instance, Socrates is a man, I am a man, therefore I am Socrates. The fallacy here is the implication that all men are Socrates, which, alas, clearly, is not the case.

It is respectfully submitted that the fallacy regarding CSAAS goes: 1. Some children delay disclosure of wrongdoings committed against them; 2. Child sex abuse is a wrongdoing committed against a child, 3. Therefore, children who claim to have been sexually abused years after the purported abuse occurred delay or recant because of the dynamics of child sexual abuse itself. It is respectfully submitted that, based upon the literature, " "[t]here

[i]s a missing link in the chain of … reasoning. The syllogism [i]s not complete.' " Sweezy v. New Hampshire, 354 U.S. at 251. The incomplete syllogism is, respectfully, that the delay in disclosure is caused by or related to the child sexual abuse itself, and, it is submitted, that the science is not clear that there is a cause and effect.

For the reasons stated herein, and also given that jurors are far more knowledgeable on this issue than they were in the 1980s, the admission of such evidence against Petitioner served to violate his right to due process of law.

We submit that also that the admission of the evidence was not harmless in that it cannot be said beyond a reasonable doubt that the result of the trial would have been more favorable without the evidence. See Chapman v. California, 386 U.S. 18 (1967).

Here, while there was testimony from both MD and ZR regarding what had happened to them, this evidence was attacked by showing that the allegations were not plausible. Specifically, regarding MD, it was brought out that Petitioner weighed over 400 pounds and had difficulty walking, which calls into question her testimony about how Petitioner was able to maneuver himself behind her in the manner she testified, and, furthermore, how Petitioner would have been able to simply stand up and walk away.

Additionally, as to ZR's testimony, the defense called Christopher Ruckel, who testified he recalled going to Monsters, Inc. and also, unlike ZR, he recalled that they saw Cowboys & Aliens, and he recalled that Petitioner was sitting right between him and ZR and that nothing unusual happened during the movie and that he recalled ZR was behaving normally

after each movie. Such evidence, we submit, represents a reasonable doubt and makes it such that the court's decision to admit this evidence cannot be considered harmless error.

    C.    PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF
          COUNSEL IF HIS TRIAL COUNSEL WAS REQUIRED TO OBJECT
          ON THIS GROUND.

Under the well-worn rule stated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), a defendant receives constitutionally deficient representation under the United States Constitution where there is a reasonable probability that, but for counsel's unprofessional errors, the defendant would have achieved a better result. <u>Id</u>. at 694.

In the instant matter, one can anticipate that Respondent will contend that, while Petitioner's trial counsel objected to the admission of CSAAS evidence, his objections were not on the grounds specifically stated herein, i.e., that the admission violated Petitioner's federal due process rights. This issue was, nonetheless, brought before both the California Court of Appeal and the California Supreme Court.

We submit that an objection would have been futile and, as such, it would make no sense to require Petitioner to make this specific objection at the trial court level. That is, the trial court would have been required to follow the California Supreme Court's rulings concerning the admissibility of CSAAS in effect at the time of trial. <u>See</u> <u>Auto Equity Sales, Inc. v. Superior Court</u>, 57 Cal. 2d 450, 455 (1962).

In the event that this Court should disagree with this conclusion, and conclude that an objection should have been made at the trial court level, we submit that Petitioner's criminal trial counsel was ineffective for failing to raise this federal constitutional issue. The legal and social landscape has

changed significantly since the 1980s. That is, for instance, is the notion that a child will delay disclosing sexual abuse until years after the fact a commonly held "myth" among potential jurors like it was back in the 1980s? We submit the answer here is no.

Cases of individuals waiting to disclose abuse for years or even decades are legion and are of common knowledge across the country. These include the Catholic priest abuse scandals, the Boy Scouts of America's abuse scandals, and the Penn State football sex abuse scandal, where Penn State football coach Jerry Sandusky abused children for decades and was caught and imprisoned.

In fact, our nation's current vice president has been criticized for not doing more to investigate and prosecute decades-old claims of sexual abuse by Catholic clergy back when she was both a San Francisco County District Attorney and California's Attorney General. See, e.g., Victims Question Kamala Harris' Record on Clergy Abuse, https://apnews.com/ecc0da5f6ac94b13be11e2a388967a85 (as of Nov. 14, 2022). Furthermore, the California legislature, which represents the voice of the people (see People's Advocate, Inc. v. Superior Court, 181 Cal. App. 3d 320, 322 (1986)) has been moved by the issue to expand the statute of limitations for victims of sexual abuse to be able to bring lawsuits years after they suffered abuse, thereby presuming that there will be a delay in many if not most cases in revealing the abuse. Cal. Code of Civ. Proc. § 340.16. Put simply, if these old "myths" discussed by Ms. Ward still held sway, the state's electorate would view, for instance, the enactment of Cal. Code of Civ. Proc. § 340.16, as a gross miscarriage of justice, since it would empower people to sue for abuse that could not have possibly happened, else

it would have been promptly disclosed to the authorities at the time and the offenders properly dealt with by the state's criminal justice system.  Put simply, a "myth" is generally understood to be a commonly held belief that is not true. Here, it would seem, that the "myths" discussed by Ms. Ward are, in fact, not myths at all any longer and, as such, there is no need to continue to permit such testimony in the courts of our state.

Accordingly, there is not the likelihood that jurors will fall prey to misconceptions about child sex abuse reporting as they may have back in the 1980s. As noted, other states courts and federal courts have challenged the premise of the admissibility of CSAAS evidence, and, as such, we submit, a competent California criminal defense attorney would have been aware of such developments and would have sought to give an advantage, on appeal, to his or her client. Furthermore, one can divine no tactical advantage to Petitioner from the admission of this evidence.

As such, we submit that, if an objection was required, that trial counsel was constitutionally ineffective for failing to object.

IV.    THE TRIAL COURT ERRED IN ADMITTING THE TESTIMONY OF JACQUELINE PALIC, AND SAID ERROR VIOLATED APPELLANT'S RIGHT TO DUE PROCESS OF LAW UNDER THE FEDERAL CONSTITUTION.

This claim is based, in part, upon a violation of Petitioner's rights under the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Specifically, that the trial court violated Petitioner's Due Process rights in admitting Ms. Palic's testimony.

In the instant matter, Ms. Jacqueline Palic was permitted to testify to alleged acts that Petitioner committed against her in the state of Kansas

when he was a teenager. These were, quite obviously, uncharged criminal acts and were admitted under Cal. Evidence Code § 1108. We submit that the admission of these statements violated Petitioner's federal constitutional rights to Due Process of law and a fair trial. Furthermore, we submit that Petitioner received constitutionally ineffective assistance of counsel under the federal constitution when his trial counsel failed to properly and specifically object to the admission of said evidence.

A. FEDERAL CONSTITUTIONAL PRINCIPLES.

The issue comes against the federal Due Process clause's disdain for admission of "bad character" evidence, which dates back to English common law and which the United States Supreme Court has noted ties into the United States Constitution's concept of Due Process of law.

Respecting English common law, in 1684, Justice Withins recalled a prior case in which the court excluded evidence of any forgeries, except the one for which the defendant was standing trial. Hampden's Trial, 9 How. St. Tr. 1053, 1103 (K.B. 1684). Similarly, in Harrison's Trial, 12 How. St. Tr. 834 (Old Bailey 1692), the Lord Chief Justice excluded evidence of a prior wrongful act of a defendant who was on trial for murder, saying to the prosecution: "Hold, what are you doing now? Are you going to arraign his whole life? Away, away, that ought not to be; that is nothing to the matter." Early American courts retained the rule against using "other acts" evidence as character evidence to show action in conformity therewith. See, e.g., Rex v. Doaks, Quincy's Mass. Reports 90 (Mass. Super. Ct.1763)(excluding evidence of former acts of lasciviousness from the trial of a defendant accused of keeping a bawdy house); Boyd v. United States, 142 U.S. 450,

458 (1892)(finding that admission of prior crimes committed by defendants so prejudiced their trial as to require reversal).

As acknowledged by the U.S. Supreme Court in <u>Brinegar v. United States</u>, 338 U.S. 160, 174 (1892)(emphasis supplied): "*Guilt* in a criminal case *must be proved* beyond a reasonable doubt and *by evidence confined to that which long experience in the common-law tradition*, to some extent embodied in the Constitution, has crystallized into rules of evidence consistent with that standard. These rules are historically grounded rights of our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property."

The United States Supreme Court further observed in a different case that:

> *Courts that follow the common law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt.* Not that the law invests the defendant with a presumption of good character, [citation], but it simply closes the whole matter of character, disposition, and reputation on the prosecution's case-in-chief. The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury, and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise, and undue prejudice.

<u>Michelson v. United States</u>, 335 U.S. 469, 475-476 (1948)(emphasis supplied

and footnotes omitted).

Thus, we submit that United States Supreme Court jurisprudence clearly supports the conclusion that erroneous admission of character evidence can deny a defendant his or her right to Due Process of law and to a fair trial as guaranteed by the U.S. Constitution.

B. PETITIONER'S RIGHTS WERE VIOLATED.

In the instant matter, Petitioner was charged with committing offenses against 2 girls when they were 9-14 years of age when he was a middle aged man. The alleged acts against Ms. Palic occurred when Petitioner was much younger and thus closer in age to her than he was to the 2 complainants in the instant matter, thus meaning that the offenses were not similar as the People had contended and the trial court found before deciding to admit them.

The evidence here was not so overwhelming as to made the admission of this evidence harmless error. See Chapman v. California, 386 U.S. 18 (1967).

Here, while there was testimony from both MD and ZR regarding what had happened to them, this evidence was attacked by showing that the allegations were not plausible. Specifically, regarding MD, it was brought out that Petitioner weighed over 400 pounds and had difficulty walking, which calls into question her testimony about how Petitioner was able to maneuver himself behind her in the manner she testified, and, furthermore, how Petitioner would have been able to simply stand up and walk away.

Additionally, as to ZR's testimony, the defense called Christopher Ruckel, who testified he recalled going to Monsters, Inc. and also, unlike

ZR, he recalled that they saw Cowboys & Aliens, and he recalled that Petitioner was sitting right between him and ZR and that nothing unusual happened during the movie and that he recalled ZR was behaving normally after each movie. Such evidence, we submit, represents a reasonable doubt and makes it such that the lower court's decision to admit this evidence cannot be considered harmless error.

C. INEFFECTIVE ASSISTANCE OF COUNSEL.

Finally, one can foresee that Respondent will contend that Petitioner did not properly object to the admission of this evidence on Due Process grounds at the trial court level, even though this issue was briefed to both the California Court of Appeal and the California Supreme Court in this matter. We contend that such an objection would have been futile and, if the Court finds that it would not have been futile, Petitioner received ineffective assistance of counsel as a result of trial counsel's failure to object on this ground. See Strickland v. Washington, 466 U.S. 668. Here, it is submitted that there was no tactical reason to omit an objection on Due Process grounds and that, by failing to raise this issue, Petitioner was prejudiced. As such, we submit that the Court, if it finds a waiver, should permit Petitioner to raise this issue in this forum through application of the principles elucidated in Strickland, to wit, that Petitioner received constitutionally ineffective assistance of counsel.

V.    THE TRIAL COURT IMPROPERTY ADMITTED EVIDENCE FOUND ON APPELLANT'S MOBILE TELEPHONE, WHICH VIOLATED NOT ONLY STATE LAW BUT ALSO APPPELLANT'S RIGHT TO DUE PROCESS AND A FAIR TRIAL UNDER THE STATE AND FEDERAL CONSTITUTIONS.

This claim is based upon a violation of Petitioner's rights under the
"Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).
Specifically, we submit that the trial court erred as a matter of federal
constitutional law in admitting evidence procured from Petitioner's mobile
telephone. We submit also that Petitioner received ineffective assistance of
counsel under the federal constitution when his trial counsel failed to
completely and specifically object to the admission of this evidence.

Prior to trial, Petitioner sought to prevent the admission of items
found on his mobile telephone. The trial court found these items relevant
and they were admitted at trial.

A. FEDERAL CONSTITUTIONAL PRINCIPLES.

Respecting English common law, in 1684, Justice Withins
recalled a prior case in which the court excluded evidence of any forgeries,
except the one for which the defendant was standing trial. Hampden's Trial,
9 How. St. Tr. 1053, 1103 (K.B. 1684). Similarly, in Harrison's Trial, 12
How. St. Tr. 834 (Old Bailey 1692), the Lord Chief Justice excluded evidence
of a prior wrongful act of a defendant who was on trial for murder, saying
to the prosecution: "Hold, what are you doing now? Are you going to arraign
his whole life? Away, away, that ought not to be; that is nothing to the
matter." Early American courts retained the rule against using "other acts"
evidence as character evidence to show action in conformity therewith. See,
e.g., Rex v. Doaks, Quincy's Mass. Reports 90 (Mass. Super.
Ct.1763)(excluding evidence of former acts of lasciviousness from the trial
of a defendant accused of keeping a bawdy house); Boyd v. United States,

142 U.S. 450, 458 (1892)(finding that admission of prior crimes committed by defendants so prejudiced their trial as to require reversal).

As acknowledged by the U.S. Supreme Court in <u>Brinegar v. United States</u>, 338 U.S. 160, 174 (1892)(emphasis supplied): "*Guilt* in a criminal case *must be proved* beyond a reasonable doubt and *by evidence confined to that which long experience in the common-law tradition*, to some extent embodied in the Constitution, has crystallized into rules of evidence consistent with that standard. These rules are historically grounded rights of our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property."

The United States Supreme Court further observed in a different case that:

> *Courts that follow the common law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt.* Not that the law invests the defendant with a presumption of good character, [citation], but it simply closes the whole matter of character, disposition, and reputation on the prosecution's case-in-chief. The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury, and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise, and undue prejudice.

<u>Michelson v. United States</u>, 335 U.S. 469, 475-476 (1948)(emphasis supplied

and footnotes omitted).

Thus, we submit that United States Supreme Court jurisprudence clearly supports the conclusion that erroneous admission of character evidence can deny a defendant his or her right to Due Process of law and to a fair trial as guaranteed by the U.S. Constitution.

### B. PETITIONER'S RIGHTS WERE VIOLATED.

In the instant matter, Riverside County Sheriff's Deputy Robert Cornett was permitted to testify concerning items recovered from Petitioner's mobile device. He testified taking possession of Petitioner's mobile telephone and searching it and finding website history for sites with titles, "Father Fucks Schoolgirl Daughter" and "Father and Daughter Live on Cute Baby Cam." (I RT 243.) He was not able to access such websites to see any images that they might have purportedly contained but was allowed to speculate this was due to the nature of child pornography websites. He also testified that he saw book titles on the mobile device, to wit: "The Bondage Breaker: Overcoming Negative Thoughts, Irrational Feelings, and Habitual Sins" by Neil Anderson, and "Healing the Wounds of Sexual Addiction" by Mark Laser, and "Breaking Porn Addiction and how to Quit for Good" by J.S. Park. (I RT 245.)

In the instant matter, we submit that it is clear that the evidence obtained from the mobile device violated California state law, inasmuch as it was admitted to show Petitioner's character and that he acted in conformity therewith respecting Ms. Palec and MD and ZR. To contend that the alleged acts complained of here were some sort of "mistake" or "accident" would strain the bounds of credulity and it does not seem that the defense relied upon this defense at trial. Additionally, we submit that, especially

given the admission of Ms. Ward's testimony and the admission of Ms. Prieto's testimony, the admission of these items served to confuse the issues and also constituted needless presentation of cumulative evidence. Furthermore, as noted, the admission of this evidence served to violate Petitioner's right to Due Process of law as guaranteed by the United States Constitution, since this evidence constituted other act evidence that, we contend, was admitted and showed predisposition to commit the alleged offenses.

As contended hereinabove, the evidence here was not so overwhelming as to made the admission of this evidence harmless error. See Chapman v. California, 386 U.S. 18 (1967).

Here, while there was testimony from both MD and ZR regarding what had happened to them, this evidence was attacked by showing that the allegations were not plausible. Specifically, regarding MD, it was brought out that Petitioner weighed over 400 pounds and had difficulty walking, which calls into question her testimony about how Petitioner was able to maneuver himself behind her in the manner she testified, and, furthermore, how Petitioner would have been able to simply stand up and walk away.

Additionally, as to ZR's testimony, the defense called Christopher Ruckel, who testified he recalled going to Monsters, Inc. and also, unlike ZR, he recalled that they saw Cowboys & Aliens, and he recalled that Petitioner was sitting right between him and ZR and that nothing unusual happened during the movie and that he recalled ZR was behaving normally after each movie. Such evidence, we submit, represents a reasonable doubt

and makes it such that the lower court's decision to admit this evidence cannot be considered harmless error.

## C. PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.

Finally, one can foresee that Respondent will contend that Petitioner did not properly object to the admission of this evidence on Due Process grounds, and, therefore, has waived his right to raise this issue before this Court, even though Petitioner raised these issues in briefing before the California Court of Appeal and the California Supreme Court. We contend that such an objection would have been futile and, if the Court finds that it would not have been futile, Petitioner received ineffective assistance of counsel as a result of trial counsel's failure to object on this ground. See Strickland v. Washington, 466 U.S. 668 (1984). Here, it is submitted that there was no tactical reason to omit an objection on Due Process grounds and that, by failing to raise this issue, Petitioner was prejudiced. As such, we submit that the Court, if it finds a waiver, should permit Petitioner to raise this issue in this forum through application of the principles elucidated in Strickland, to wit, that Petitioner received constitutionally ineffective assistance of counsel.

## VI. THE COMBINED EFFECT OF THE TRIAL ERRORS VIOLATED APPELLANT'S RIGHT TO DUE PROCESS.

This claim is based upon a violation of Petitioner's rights under the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Specifically, that trial errors, in combination, denied Petitioner his right to due process of law as guaranteed by the federal constitution.

The U.S. Supreme Court has clearly established that the combined effect of multiple trial errors violates due process where it renders the resulting criminal trial fundamentally unfair. Chambers v. Mississippi, 410 U.S. 284 (1973); Montana v. Egelhoff, 518 U.S. 37, 53 (1996). The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal. *Chambers* 410 U.S. at 290, n.3. When the combined effect of individually harmless errors renders a criminal defense far less persuasive than it might otherwise have been, the resulting conviction violates due process. Id. at 294, 302, 303. Where a trial court commits an evidentiary error, the error is not necessarily rendered harmless by the fact there was other, cumulative evidence properly admitted. Krulewitch v. United States, 336 U.S. 440 (1949)(holding that, in a close case, erroneously admitted evidence - even if cumulative of other evidence - can 'tip the scales' against the defendant); Hawkins v. United States, 358 U.S. 74, 80 (1954)(concluding that erroneously admitted evidence, 'though in part cumulative,' may have 'tipped the scales against the petitioner on the close and vital issue of his state of mind'").

Here, we submit that the trial errors complained of here, even if, in isolation, are classified by this Court as "harmless error" when taken in combination, served to violate Petitioner's right to due process of law, which warrants granting the within petition.

## CONCLUSION

For the reasons stated herein, we ask this Court to grant the Petitioner's petition for a writ of habeas corpus, along with such other, further, and different relief as to the Court may seem just, proper, and equitable.